Filed 5/27/25  White v. Gabriel CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THOMAS WHITE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>ARIANA GABRIEL et al.,<br><br>    Defendants and Respondents,<br><br>JAMES WALL et al.,<br><br>    Defendants and Appellants. | H051530<br>(Santa Clara County<br>Super. Ct. No. 22CV408831)<br><br>**ORDER MODIFYING OPINION AND DENYING PETITIONS FOR REHEARING**<br><br>**NO CHANGE IN JUDGMENT** |

Defendants' petitions for rehearing are denied.  The court orders that the opinion filed April 28, 2025, be modified as follows:

The second and third sentences of the second full paragraph on page 20 of the opinion shall be deleted and replaced with the following three sentences:

The SSI Slack post was made in a channel containing thousands of students, faculty, recent graduates, and aerospace professionals, and the *Fountain Hopper* publication was available to almost tens of thousands of Stanford community members.  Because the common interest privilege is intended to apply to a narrow range of private interests, neither publication falls under the common interest privilege.  (*Brown*, *supra*, 48 Cal.3d

at p. 727.)  Both publications were so widely disseminated as to defeat the purpose of the common interest privilege.

There is no change in the judgment.

_____
Greenwood, P. J.

_____  _____
Grover, J.            Danner, J.

2

Filed 4/28/25  White v. Gabriel CA6 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THOMAS WHITE, | H051530 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 22CV408831) |
| v. | |
| ARIANA GABRIEL et al., | |
| Defendants and Respondents, | |
| JAMES WALL et al., | |
| Defendants and Appellants. | |

Thomas White sued Ariana Gabriel, Julia Thompson, James Wall, and Maya Harris (together, defendants) for defamation, alleging defendants spread false rape and sexual assault accusations against him while they all attended Stanford University. Defendants moved to strike the complaint under Code of Civil Procedure, section 425.16 (the anti-SLAPP statute).[1]  The trial court granted Gabriel and Thompson's motions to strike in their entirety and Wall and Harris's joint motion in part.  White now appeals the trial court's order, and Wall and Harris cross-appeal.  For the reasons stated below, we reverse the trial court's order on the three anti-SLAPP motions and remand with directions to deny all three motions to strike the defamation claim in part.

---

[1] Unspecified statutory references are to the Code of Civil Procedure.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. *The Parties' Relationships*

White and defendants are former or current students at Stanford. As undergraduates, White and Gabriel lived in the same dorm complex and participated in the Stanford Debate Society. White, Thompson, and Wall were roommates who participated in a space-themed cover band with Harris. All four students also participated in the Stanford Space Initiative (SSI), a student-run organization for students pursuing careers in the aerospace industry. White later became a graduate student at Stanford and continued to participate in SSI.

According to Gabriel and Wall, White sexually assaulted them while they were undergraduates at Stanford. Gabriel asserts White sexually assaulted her[2] five times and she recalled the key details months later due to amnesic episodes. Wall claims White sexually assaulted him[3] once, and his memory of the events also emerged over time.

Gabriel and Wall subsequently reached out to Stanford's Sexual Harassment/Assault Response & Education Title IX Office (Title IX Office). Wall filed a formal complaint that he withdrew two months later. Gabriel, however, met with the Title IX coordinator with Thompson and sent the coordinator and an investigator information regarding White's alleged assaults. According to defendants, Gabriel informed them she was going to file a Title IX report, and all four defendants agreed to organize information to present to the Title IX Office. The Title IX Office accepted Gabriel's formal complaint two months later, and White was notified of the investigation the same day.[4]

---

[2] According to the record, Gabriel uses they/them pronouns, but her brief refers to Gabriel by she/her pronouns. We defer to the pronouns used in Gabriel's brief.

[3] According to defendants, James Wall now identifies as a male but identified as female at the time of the alleged assault. We use he/his pronouns to refer to Wall.

[4] The record does not confirm the status of the Title IX investigation. White states it was still ongoing at the time of the appeal.

B. *The Defamation Lawsuit*

White filed a defamation lawsuit against defendants, alleging they conspired to spread false rape and sexual assault accusations against him. He pled defendants made four defamatory communications to individual Stanford students, two defamatory statements to and on behalf of a former employer, and two defamatory statements to the larger Stanford community.[5] White also asserted defendants made defamatory communications to numerous other people and he had to republish the statements to others to defend his reputation.

Defendants moved to strike all causes of action within White's complaint. They argued they reached out to others because they were concerned about their safety and wanted to provide relevant information to the Title IX Office. White opposed the motions to strike.

While the anti-SLAPP motions were pending, the trial court granted in part White's motion to lift a discovery stay. White was allowed to take limited depositions of each defendant to address publication, subpoena documents from Stanford relating to defendants' sexual assault complaints against White, and obtain communications in defendants' possession regarding any sexual assault allegations against White.

_____

[5] The four alleged defamatory communications involving Stanford students include: (1) a conversation between Wall, Harris, and two other students named Glikbarg and S.V., (2) a text message from Wall to Glikbarg, (3) a recorded call between White, defendants, and Gabriel's friend, and (4) a text message, drafted by defendants, sent by Harris to eight Stanford students. Later in this opinion we refer to these as the "Four Communications to Individual Stanford Students."

The two alleged defamatory communications involving a former employer include: (1) a conversation between Gabriel and her former internship employers at Zipline, and (2) a text message from Gabriel to Glikbarg on behalf of Zipline. We refer to these as the "Two Zipline Communications."

The two alleged defamatory communications involving the larger Stanford community include: (1) a post on Stanford's SSI Slack channel, and (2) an article written and published by defendants in the *Fountain Hopper*, an independent Stanford publication read by Stanford students. We refer to these as "Two Defamatory Communications to the Larger Stanford Community."

3

The trial court granted Gabriel and Thompson's separate motions to strike in full, striking the defamation claim based on the two communications involving Gabriel's former employer. It granted Wall and Harris's joint motion to strike in part, striking the claim as to three of the four alleged communications to individual Stanford students and one of the two alleged communications to the larger Stanford community. The court denied Wall and Harris's motion to strike the defamation claim as to one allegation based on a conversation between individual Stanford students and one allegation based on a Slack post made to the larger Stanford community.

White timely appealed the trial court's order, and Wall and Harris timely cross-appealed.

## II. DISCUSSION

White does not analyze the alleged defamatory communications individually. Instead, he argues none of the statements are protected under the anti-SLAPP statute because they concern sexual assault between private parties and do not raise public issues contributing to existing public debate.[6] He also argues the statements are not protected because they were made prior to the Title IX Office's official acceptance of Gabriel's formal complaint and were not made by a pre-litigation investigator. White contends he has made a sufficient showing of each element of defamation, including the inapplicability of any privilege. He maintains the trial court failed to consider all the evidence and draw inferences in his favor and should have denied the motions in their entirety.

Defendants argue White failed to engage in the claim-by-claim analysis required to successfully defend against an anti-SLAPP motion to strike. They assert all the alleged defamatory statements were connected to the Title IX investigation, were made in

---

[6] White includes two attachments to his reply brief, but there is no showing any of the documents attached to White's brief are part of the appellate record. We accordingly do not consider them in this appeal. (Cal. Rules of Court, rule 8.204(d).)

public forums and in furtherance of their right to petition or free speech, and were related to public issues.  Defendants also argue White did not properly plead a prima facie case of defamation, including libel as to the written statements, and all the factual allegations are protected by the litigation privilege, common interest privilege, or the fair and true report privilege.  Defendants maintain White is barred from amending his complaint, and the trial court properly considered the evidence and struck White's meritless allegations.

A.  *The Anti-SLAPP Statute*

Section 425.16, commonly known as the anti-SLAPP statute, "provide[s] a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights" under the First Amendment.  (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055-1056.)  The anti-SLAPP statute authorizes a special motion to strike claims "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  (§ 425.16, subd. (b)(1).)  Such motions to strike serve to prevent and deter lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech, seeking to screen out meritless claims early, before the defendant's resources are drained.  (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 312 (*Flatley*).)  The anti-SLAPP statute is to be construed broadly. (§ 425.16, subd. (a).)

We review the trial court's order on an anti-SLAPP motion de novo.  (*Flatley*, *supra*, 39 Cal.4th at p. 325.)  A court must "consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).)

We evaluate a trial court's denial of a motion to strike under section 425.16 in two steps.  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.)  First, we resolve the threshold inquiry whether the moving defendant made a prima facie showing "that the

5

challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged. [Citations.]" (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061.) "A defendant satisfies the first step of the analysis by demonstrating that the 'conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e) [of section 425.16]' [citation], and that the plaintiff's claims in fact *arise* from that conduct [citation]." (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 620 (*Rand*).) The categories protect any written or oral statement or writing made: (1) "before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law," (2) "in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law," and (3) "in a place open to the public or a public forum in connection with an issue of public interest," or (4) "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

If we determine the defendant has made the showing at the first step, the burden shifts to the plaintiff to demonstrate "a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) At this second " 'summary-judgment-like' " step, the plaintiff must demonstrate its claim has minimal merit. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384-385 (*Baral*).) The plaintiff " 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence. [Citations.]' " (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.) Such evidence includes evidence uncovered in discovery, which must be limited to the issues raised in the motion to strike. (See § 425.16, subd. (g); *Slauson Partnership v. Ochoa* (2003) 112 Cal.App.4th 1005, 1021.) "The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a

favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.]" (*Baral*, at pp. 384-385.) Defendant bears the burden of proof on any affirmative defense. (*Laker v. Board of Trustees of California State University* (2019) 32 Cal.App.5th 745, 769 (*Laker*).) If the plaintiff fails to show its claim has minimal merit, "then the trial court should deem the cause of action a SLAPP and should strike it. [Citation.]" (*Id.* at p. 760.)

  B. *Scope of Review*

  White pled one count of defamation involving eight communications. He argues the trial court erred by failing to consider additional defamatory statements uncovered in discovery that would render his defamation claim actionable. " 'It is not our role to engage in what would amount to a redrafting of [a] complaint in order to read that document as alleging conduct that supports a claim that has not in fact been specifically alleged, and then assess whether the pleading that we have essentially drafted could survive the anti-SLAPP motion directed at it.' [Citation.]" (*Medical Marijuana, Inc. v. ProjectCBD.com* (2020) 46 Cal.App.5th 869, 883, italics omitted (*Medical Marijuana*).) We will not consider defamatory statements not properly alleged in the complaint. (See *id.* at pp. 883, 893-894.)

  We address the eight alleged communications individually. (See *Baral*, *supra*, 1 Cal.5th at p. 396.) White argues defendants' motions should have been denied in their entirety because some of the claims based on challenged activities support the defamation cause of action. White is not correct. Where a cause of action is based on multiple claims arising out of a variety of factual allegations, as here, we analyze each claim for relief and strike the claims falling under the anti-SLAPP statute and allow other claims within the same cause of action to go forward. (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1010-1011.) Defendants, as the moving parties, have properly identified and addressed the factual allegations individually. (*Ibid.*; *Young v. Midland Funding*

7

*LLC* (2023) 91 Cal.App.5th 63, 99-100.) Evaluating each allegation separately, we conclude all eight communications are protected speech under the anti-SLAPP statute but only two communications involving the larger Stanford community support a finding of minimal merit.

C. *Step One*

1. <u>Speech in Connection with a Public Issue or Matter of Public Interest</u>

The parties dispute whether the alleged acts are protected under section 425.16, subdivision (e)(4) (the public interest provision). The public interest provision defines protected activity to include "any . . . conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16(e)(4)). This subdivision serves as "a catchall provision." (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 139 (*FilmOn*).) Under the provision, no public forum is required, and even private conduct is protected if the communications concern issues of public interest. (*Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 736.) We determine all eight alleged communications are protected under this provision.

The Supreme Court evaluated the public interest provision in *FilmOn*. (*FilmOn*, *supra*, 7 Cal.5th at p. 139.) FilmOn.com Inc. sued an online tracking company called DoubleVerify for allegedly disparaging FilmOn's web-based network in confidential reports to DoubleVerify's paying clients. (*Id.* at p. 140.) FilmOn alleged the reports falsely indicated its network engaged in copyright infringement and featured adult conduct, resulting in the loss of advertisements on FilmOn's network. (*Id.* at pp. 141-142.) The Supreme Court established the inquiry under the public interest provision requires a two-step analysis. "First, we ask what 'public issue or [] issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. [Citation.] Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest. It is

8

at the latter stage that context proves useful." (*Id.* at pp. 149-150.) The Court determined DoubleVerify's reports implicated the public issues of copyright infringement and children's exposure to sexually explicit media content. (*Id.* at pp. 140, 152-154.) However, the reports were not protected under the public interest provision because they were too remotely connected to those public issues under the second step of the analysis, as the reports were generated for profit, were exchanged confidentially to paying clients, and were not intended to enter the public sphere. (*Id.* at pp. 140, 152-154.)

We commence our review by examining the content of the eight alleged acts. The first step of the public interest provision "is satisfied so long as the challenged speech or conduct, considered in light of its context, may reasonably be understood to implicate a public issue, even if it also implicates a private dispute." (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1253 (*Geiser*).) "[T]he focus of our inquiry must be on 'the specific nature of the speech,' rather than on any 'generalities that might be abstracted from it.' [Citation.]" (*FilmOn*, *supra*, 7 Cal.5th at p. 152.) The challenged statements in this case directly or implicitly concern White's purported sexual assaults and violence. Sexual violence is a matter of concern to the larger public. (See *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1547 (*Terry*) [involving alleged child sex abuse].) The concern here was pressing because White was a Stanford graduate student and a member of SSI at the time of the alleged statements. His alleged sexual violence could affect large numbers of students beyond defendants. (*FilmOn*, at p. 145; see *Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 482-483 (*Grenier*) [in child sex abuse case by church pastor, "public interest" is broadly construed to include private conduct impacting a broad segment of society or a large community].) Therefore, the eight statements implicate public issues.

Having identified the matters of public interest in the speech, we turn to the pith of the parties' arguments—the second step of the *FilmOn* test. This step requires " 'some degree of closeness' " between the statements and the public interest. (*FilmOn*, *supra*,

9

7 Cal.5th at p. 150.) " '[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate.' [Citations.]" (*Ibid.*) When assessing whether a statement contributes to the public debate, "[w]e are not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether a defendant—through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest. [Citations.]" (*Id.* at p. 151.) In conducting this examination, we consider "context—including audience, speaker, and purpose." (*Id.* at p. 152.)

All eight statements by defendants contributed to the public discussion of sexual violence and safety on Stanford's campus. Defendants, believing White had a history of sexual violence and access to weapons, reached out to Stanford and Zipline community members with the expectation the shared information would protect others and further the Title IX investigation. (See *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 375 [tenant's private warning to a buyer's agent that a convicted sex offender lived nearby was directly related to public issue because it served to alert prospective buyers of the potential risk to children]; *Grenier*, *supra*, 234 Cal.App.4th at p. 483 [defendants' statements alleging child sex abuse were connected to a public issue because they attempted to warn people from attending the church with plaintiff as the pastor and generally raised issue of child molestation and abuse].) These statements contributed to the existing community discussion concerning Stanford's deficient response to sexual violence on campus. (*Terry*, *supra*, 131 Cal.App.4th at pp. 1550-1551 [statements accusing church's youth group leaders of inappropriate sexual contact with a minor contributed to the ongoing public debate about how the church could keep sexual predators out of leadership positions].) Although defendants' statements implicated a private figure and some of the alleged communications were made to individuals, "no single element is dispositive" under the second step of the analysis. (*FilmOn*, *supra*, 7 Cal.5th at p. 153.) All the

10

communications sought to draw public attention to White's alleged sexual violence for safety and investigatory purposes. (See *Geiser*, *supra*, 13 Cal.5th at p. 1255 [sidewalk demonstration furthered the public discussion of the implicated public issues because demonstration served to draw attention to the alleged unfairness of foreclosure and eviction practices].) We hold all of defendants' statements underlying White's defamation claim have the requisite degree of closeness required for protection under the second step of the public interest provision. (*FilmOn*, at p. 150; *Rand*, *supra*, 6 Cal.5th at p. 620.)

As the eight communications qualify as protected speech under the public interest provision, we need not determine whether the acts are protected under other subdivisions of the anti-SLAPP statute. (See *Navellier v. Sletten* (2002) 29 Cal.4th 82, 88.)

D. *Step Two*

Finding all the alleged defamatory statements are protected under step one of the anti-SLAPP statute, we turn to step two to determine whether White has demonstrated his defamation claim has minimal merit. (See *Baral*, *supra*, 1 Cal.5th at pp. 384-385.) To prove defamation, a plaintiff must show (1) a publication is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or cause special damages. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720 (*Taus*).) In addition, a private person must demonstrate the defendant "failed to use reasonable care to determine the truth or falsity [citation]" of the alleged defamatory statement. (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 470 (*Hecimovich*).)

A defamation claim is not actionable without a showing of falsity because truth is a complete defense to defamation. (See *Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 293 (*Hawran*).) " '[I]t is not the literal truth or falsity of each word or detail used in a statement which determines whether or not it is defamatory; rather, the determinative question is whether the 'gist or sting' of the statement is true or false, benign or

11

defamatory, in substance.' [Citation.]" (*Issa v. Applegate* (2019) 31 Cal.App.5th 689, 702 (*Issa*).)

White argues he has presented sufficient facts to satisfy the elements of defamation, including falsity and negligence, and argues defendants' statements do not qualify under any relevant privilege. Defendants argue White has not proven each element of defamation as to each alleged communication, including negligence, falsity, and special damages. They maintain the statements are protected under the litigation, common interest, and fair and true report privileges.

White fails to show the defamation claim based on the four communications to individual Stanford students and the two communications involving Zipline has minimal merit. The allegations based on these six communications must be stricken from the complaint. (*Laker*, *supra*, 32 Cal.App.5th at p. 760.) The defamation claim based on the two communications to the larger Stanford community may proceed.

### 1. Four Communications to Individual Stanford Students

The four alleged defamatory communications to individual Stanford students are protected by the common interest privilege. This privilege protects a communication made "without malice, to a person interested therein, . . . by one who is also interested." (Civ. Code, § 47, subd. (c).) The common interest privilege is "recognized where the communicator and the recipient have a common interest and the communication is of a kind reasonably calculated to protect or further that interest." (*Deaile v. General Telephone Co. of California* (1974) 40 Cal.App.3d 841, 846 (*Deaile*).) "The 'interest' must be something other than mere general or idle curiosity, such as where the parties to the communication share a contractual, business or similar relationship or the defendant is protecting his own pecuniary interest. [Citation.]" (*Hawran*, *supra*, 209 Cal.App.4th at p. 287.) The privilege is limited to only "to a narrow range of private interests" and does "not [] create any broad news-media privilege." (*Brown v. Kelly Broadcasting Co*. (1989) 48 Cal.3d 711, 727 (*Brown*).) Under the privilege, "defendant generally bears the

12

initial burden of establishing that the statement in question was made on a privileged occasion, and thereafter the burden shifts to plaintiff to establish that the statement was made with malice. [Citation.]" (*Taus*, *supra*, 40 Cal.4th at p. 721.)

### a. Common Interest

Defendants have shown their statements to fellow Stanford students were made in situations where the communicator and the recipient shared a common interest to protect the safety of other students. Communications among various members of a school concerning topics of interest to the school fall within the privilege. (See *Hicks v. Richard* (2019) 39 Cal.App.5th 1167, 1177-1178 (*Hicks*); *Hecimovich*, *supra*, 203 Cal.App.4th at pp. 471-472.) In *Hicks*, the court found a common interest between parents of parochial schoolchildren and church authorities overseeing the school after a parent on the school's advisory board sent the church authorities a letter regarding the principal's conduct. (*Hicks*, at pp. 1177-1178; see also *Martin v. Kearney* (1975) 51 Cal.App.3d 309, 312 [communications by parents of school children regarding teacher made to school officials fall within the privilege].) In *Hecimovich*, the court determined a parent teacher organization's communications regarding a coach's ability and qualities were protected by the common interest privilege because they were made to "interested persons" who were entitled to it, such as school officials, parent-teacher members responsible for the boys' basketball program, the assistant coach, parents of the child player, and league parents. (*Hecimovich*, at p. 472.) Similarly here, defendants were Stanford students who made statements about a current Stanford graduate student to fellow students. These students were "interested persons" entitled to information regarding their safety as students at the school.

### b. Malice and Excessive Publication

Because the four statements were made on a privileged occasion, the burden shifts to White to establish a showing of malice. (*Taus*, *supra*, 40 Cal.4th at p. 721.) Malice is not inferred from the communication. (Civ. Code, § 48.) Instead, "malice has been

defined as 'a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person.' [Citation.]" (*Brown*, *supra*, 48 Cal.3d at p. 723.) " ' "The malice necessary to defeat a qualified privilege is 'actual malice' which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights [citations]." ' " (*Taus*, at p. 721.)

The evidence presented in the trial court is insufficient to establish a prima facie case of actual malice. White argues defendants acted with malice because their inherently improbable allegations show they lacked reasonable grounds for belief in the truth of the publications. However, we do not weigh the evidence at this stage. (See *Baral*, *supra*, 1 Cal.5th at p. 384.) Instead, we accept White's evidence as true and also evaluate defendants' evidence to determine if it defeats plaintiff's claim as a matter of law. (*Id.* at pp. 384-385.) Defendants submitted evidence demonstrating they believed White committed sexual assaults and had a history of violence, which White simply denies. We cannot conclude defendants lacked reasonable belief in their allegations on this record.

White also points to general hostile statements by defendants regarding White. " 'A court may consider a defendant's anger or hostility toward a plaintiff in determining the presence of malice only to the extent it impacts the defendant's *actual belief* concerning the truthfulness of the publication. [Citation.] The focus is thus on the " 'defendant's attitude toward the truth or falsity of the material published . . . [not] the defendant's attitude toward the plaintiff.' " ' [Citations.]" (*Hicks*, *supra*, 39 Cal.App.5th at p. 1178.) The record does not show defendants' hostility towards White affected their belief that what they were saying was true.

Nor were the privileged acts excessively published. Excessive publication may defeat the common interest privilege. (*Deaile*, *supra*, 40 Cal.App.3d at p. 847.)

14

Excessive publication occurs when a statement is published "to those with no interest in the business or for any nefarious motives." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 442.) As stated above, the four communications were all made to fellow Stanford students who hold an interest in the content of the statements due to safety concerns. White cannot show excessive publication or actual malice.

We conclude White cannot prevail on these four communications because the statements are privileged. Therefore, we need not address whether White has proven minimal merit as to the other elements of a defamation claim.

### 2. Two Zipline Communications

#### a. Minimal Merit

White has not met his burden to prove a prima facie case of defamation based on Gabriel's text to another Stanford student regarding Zipline's investigation into White.[7] White fails to demonstrate the text message "has '[a]n essential element of libel' which is 'a *false statement of fact*' about plaintiff. [Citation.]" (*Bartholomew v. YouTube, LLC.* (2017) 17 Cal.App.5th 1217, 1230.) Courts determine whether a statement is actionable fact by applying a "totality of the circumstances" test. (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385 (*Franklin*).) Courts first examine the language of the statement to determine whether the words are understood in a defamatory sense. (*Ibid.*) Language disclosing incorrect, incomplete, or an erroneous assessment of facts and not "cautiously phrased in terms of the author's impression" is more likely to be actionable. (See *Dickinson v. Cosby* (2019) 37 Cal.App.5th 1138, 1163-1164 (*Dickinson*).) Courts

---

[7] The text message stated: "Hey Chloe, this is Ari Gabriel. I am unsure how much [Wall] & [Harris] have told you about my involvement in the /[White] Situation/. I just want to give you a heads up that I spoke with Nisha (from zipline where I worked) and she is speaking with Jen about the potential risk of having [White] on the Zipline campus and value concerns when/if he applies to join the Zipline team. I wanted let [*sic*] you know this conversation was happening in case you also wanted to speak with Jen and share you [*sic*] concerns as Nisha and I have. If you have any questions or need clarification on any part of this vague message please let me know."

15

then consider the context in which the statement was made, reviewing "the audience to whom the statement was directed." (*Ibid.*) "[T]he dispositive question is whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact. [Citations.]" (*Franklin*, at p. 385.)

A reasonable fact finder could not conclude Gabriel's text message implies provably false assertions of fact. The message states Zipline was investigating White, which Gabriel asserts was true, but does not state or imply any other facts about White. Instead, Gabriel phrased her statements cautiously, using terms such as "potential risk" and "value concerns." (See *John Doe 2 v. Superior Court* (2016) 1 Cal.App.5th 1300, 1314-1315 [statements using terms such as "apparently", "my impression is", or "I think" are protected statements of opinion rather than defamatory actionable facts].) While the student recipient, Glikbarg, was likely aware of the sexual assault allegations against White due to her participation in previous conversations with defendants, Gabriel's message does not detail the factual basis for Zipline's investigation and is too vague to be actionable fact. (See *Franklin*, *supra*, 116 Cal.App.4th at p. 390 [statement that a corporation was " 'intoleran[t] of intellectual properties, copyrights, and trade secrets' was too vague to be actionable"].) We therefore need not address defendants' arguments as to the other elements of defamation with respect to this text message.

### b. Litigation Privilege

Gabriel's separate communications with Zipline regarding the Title IX investigation into White are protected by the litigation privilege. Civil Code section 47, subdivision (b), commonly known as the litigation privilege, bars a civil action for communications made in any legislative proceeding, judicial proceeding, other official proceeding authorized by law, or in the initiation or course of any other proceeding authorized by law. (*Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 360 (*Hagberg*).) This absolute privilege encompasses "statements made prior to the filing of a lawsuit, whether in preparation for anticipated litigation or to investigate the feasibility

16

of filing a lawsuit. [Citation.]" (*Id.* at pp. 360-361.) "A prelitigation communication is privileged only when it relates to litigation that is contemplated in good faith and under serious consideration. [Citations.]" (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251.)

Gabriel reached out to her former employers at Zipline because the Title IX Office asked her to contact them and identify witnesses for any potential investigation. Statements made in connection with a Title IX investigation, an official proceeding authorized by law, are protected by the litigation privilege. (See *Laker*, *supra*, 32 Cal.App.5th at pp. 764-765, 770.) Gabriel's communications with Zipline are therefore absolutely privileged.

White argues the evidence raises factual questions as to whether the Title IX proceeding was considered in good faith. But that consideration is inapposite here, as good faith is relevant only to the privilege's requirement that statements bear some logical relation to the litigation. (*Blanchard v. DIRECTV, Inc.* (2004) 123 Cal.App.4th 903, 919-922.) As stated above, we do not weigh the evidence at this stage of the analysis but do consider the facts to determine whether White can establish a prima facie probability of prevailing on his claim and whether defendants have defeated White's claim as a matter of law. (*Id.* at p. 921.) The record shows Gabriel reached out to Zipline because she believed she was required to identify witnesses for her Title IX investigation, demonstrating a logical relationship between her conversation with Zipline and the Title IX investigation. Gabriel has proven her statements to Zipline are protected by the litigation privilege.

Based on this determination, we need not address whether White has proven minimal merit as to the other elements of a defamation claim. We conclude White has failed to show a probability of prevailing on the allegations involving the two Zipline communications.

17

3.  Two Defamatory Communications to the Larger Stanford Community

a.  Preliminary Considerations

White pled two defamatory communications to the larger Stanford community: the SSI Slack post and the *Fountain Hopper* article.  The trial court reviewed the merits of Wall and Harris's motion to strike the defamation claim based on these two communications but determined Gabriel and Thompson did not have to address the protected nature of the two communications in their motions to strike because White did not allege either defendant was involved in either publication.  The court subsequently granted Gabriel and Thompson's motions to strike in full.  "To support a claim for defamation, [a plaintiff] need only establish that the individual defendants took a 'responsible part' in the publication of defamatory matter.  [Citations.]" (*Hawran*, *supra*, 209 Cal.App.4th at pp. 275-276.)  White generally pled SSI leadership and the *Fountain Hopper* made a defamatory post about him, and the record shows all defendants were involved in the creation and dissemination of both publications.  We conclude White has established all defendants took a responsible part in the publication of both communications and can prevail on these two allegations against all defendants if he is able to demonstrate the allegations have minimal merit.  (See *id.* at p. 277.)

The trial court also found White had not properly pled libel as to the *Fountain Hopper* allegation.  Libel is the written form of defamation.  (Civ. Code, §§ 44-45.) " 'The general rule is that the words constituting an alleged libel must be specifically identified, if not pleaded verbatim, in the complaint.' [Citation.]" (*Medical Marijuana*, *supra*, 46 Cal.App.5th at p. 888, italics omitted.)  Assertions of libelous statements not properly alleged in the complaint need not be considered in an anti-SLAPP motion.  (*Id.* at p. 893.)  White identified the *Fountain Hopper* article verbatim in the complaint.  The situation here is not one where the plaintiff merely attached a pages-long article to plead a libel case.  (Cf. *id.* at pp. 894-895.)  Instead, the *Fountain Hopper* article consists of a couple of sentences and is more akin to a social media posting reviewable for defamation.

18

(See *GetFugu, Inc. v. Patton Boggs LLP* (2013) 220 Cal.App.4th 141, 145-146, 155-156 [reviewing entire three-line tweet]; *Balla v. Hall* (2021) 59 Cal.App.5th 652, 664-665, 675-676, 687 [reviewing several Facebook posts for defamation].) We conclude White properly pled libel that we must address at the second step of the anti-SLAPP analysis.

        b. Minimal Merit

White has proven the claims based on the two communications to the larger Stanford community have minimal merit. The gist of the communications concern White's violation of SSI's membership agreement due to his unethical behavior and White's alleged sexual harm and violence.[8] (See *Issa*, *supra*, 31 Cal.App.5th at p. 702.) The statements consist of non-conditional and inflammatory terminology that harms White's reputation. (See *Franklin*, *supra*, 116 Cal.App.4th at p. 385; *Dickinson*, *supra*, 37 Cal.App.5th at pp. 1163-1164.) The statements were also published in a Slack channel accessible by 3,000 individuals—including faculty, recent graduates, and

---

[8] The SSI Slack post stated: "Hello everyone, in light of recent events DEI would like to make a statement about the removal of [White] from the SSI Slack: [¶] [White], former SSI copresident, has been found to have severely violated several clauses of the general membership agreement, and has gone against the ethics and general contracts of the club. In accordance with SSI policy, he has been barred from any future involvement in SSI and therefore removed from the slack. As DEI, we want to offer our support for anyone who may have experienced harm on behalf of [White] and invite you to reach out us. [¶] -The DEI team."

The *Fountain Hopper* article, titled "Rocket Man Takes Flight, Former SSI President Removed Amid Accusations of Physical and Sexual Violence," stated: "A former Stanford Space Initiative (SSI) President (rocket man [rocket emoji]) was removed from the organization earlier this month after allegedly sexually assaulting and threatening multiple students with weapons. [knife emoji] [¶] SSI members first heard about the former president's history of violence in an all-club (general) slack message sent out by their DEI team in late October. The slack message announced the former president was banned for violating a number of club ethical and membership agreements. SSI then offered resources for anyone who may have experienced harm from the former president. A source close to the issue told FoHo, his removal came after a number of students were assaulted and threatened with physical violence by the former president. [eyes emoji] [¶] This story is still developing, so expect updates soon. [¶] Want to help this story take off [rocket emoji]? Hit reply. Anonymity guaranteed."

19

aerospace professionals—and in a widely disseminated school newspaper. Defendants shared these communications while they were contacting Stanford students with information about White's alleged sexual assaults. Considering the content and context in which the statements were made, we conclude the totality of the circumstances supports a reasonable fact finder could conclude the two published statements declare provable, defamatory assertions of fact. (See *Franklin*, at pp. 385-386.)

The evidence is also sufficient to demonstrate minimal merit on the issue of reasonable care. (*Hecimovich*, *supra*, 203 Cal.App.4th at p. 470.) Defendants' allegations of sexual assault were partially based on White's refusal to admit to certain facts or allegations. The incendiary nature of their statements to the larger public without confirmation of the truth demonstrate a minimal showing of a lack of due diligence to determine their accuracy. (See *ibid.*)

Defendants' privilege defenses fail. The SSI Slack post was made in a channel containing thousands of members, and the *Fountain Hopper* publication was available to almost tens of thousands of Stanford community members. Because common interest privilege does not apply to broad media statements, neither publication falls under the common interest privilege. (*Brown*, *supra*, 48 Cal.3d at p. 727.) Both communications are also not subject to the litigation privilege because defendants did not make the statements with the intent they would assist the Title IX investigation. (*Hagberg*, *supra*, 32 Cal.4th at pp. 360-361.) Neither communication is subject to the fair and true reporting privilege because the communications do not reference a potential Title IX proceeding. (Civ. Code, § 47, subd. (d); *Hawran*, *supra*, 209 Cal.App.4th at p. 278 [privilege only applies if the substance of the publication captures the gist of the statements made in the official proceedings].)

White has demonstrated his defamation claim based on the SSI Slack and *Fountain Hopper* communications has minimal merit.

20

### III. DISPOSITION

The trial court's order on defendants' anti-SLAPP motions is reversed.  The trial court shall vacate the order and enter a new order:  (1) denying Gabriel's, Thompson's, and Wall and Harris's motions to strike the defamation claim arising out of the SSI Slack post and *Fountain Hopper* publication and (2) granting defendants' motions to strike the defamation claim arising out of all other activities, communications, and statements.  The trial court shall reinstate the defamation allegations based on the SSI Slack post and *Fountain Hopper* publication and strike references to all other statements from the complaint.  In the interests of justice, the parties shall bear their own costs on appeal.

_____

Greenwood, P. J.


WE CONCUR:


_____

Grover, J.


_____

Danner, J.


H051530 White v. Gabriel et al.